UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MONICA BATISTE o.b.o. NB                          CIVIL ACTION

VERSUS                                            NO. 14-2348-LMA-SS

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

The plaintiff, Monica Batiste ("Ms. Batiste") on behalf of her minor child, N.B., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3).

## PROCEDURAL HISTORY

On April 20, 2012, Ms. Batiste submitted an application for SSI benefits on behalf of her minor daughter, N.B., who was born in 2006. R. 98-106. The onset date was reported as March 5, 2012, R. 98, with the disabling condition reported as attention deficit hyperactivity disorder ("ADHD"). R. 112. On May 24, 2012, the application was denied. R. 54-57. On May 8, 2013, there was a hearing before an Administrative Law Judge ("ALJ"). Ms. Batiste, her daughter and their attorney were present. R. 32. On June 26, 2013, the ALJ issued an unfavorable decision. R. 10-31. On August 18, 2014, the Appeals Council denied the request for review. R. 1-5.

On October 14, 2014, Ms. Batiste filed a complaint for review of the Commissioner's decision. Rec. doc. 1. The Commissioner filed an answer and the administrative record. Rec. docs. 13 and 14. The parties filed cross-motions for summary judgment. Rec. docs. 15 and 16. Ms. Batiste is represented by counsel.

## STATEMENT OF ISSUE ON APPEAL

Issue.  Is there substantial evidence for the ALJ's finding that N.B. has a less than marked limitation in the ability to care for herself?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1. N.B. was born in 2006.  She was a school-age child on March 6, 2012, the date the application was filed, and was a school-age child at the time of the decision, June 26, 2013 (20 C.F.R. § 416.926a(g)(2)).

2. N.B. had not engaged in substantial gainful activity since March 6, 2012, the application date (20 C.F.R. §§ 416.924(b) and 416.971 et seq.).

3. N.B. had the following conditions which were severe conditions within the constraints of Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985), and SSR 96-3p:  ADHD and mood disorder, not otherwise specified (20 C.F.R. § 416.924(c)).

4. N.B. did not have a condition or combination of conditions that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925 and 416.926).  Specifically, Listings 112.04 Mood Disorders and 112.11 ADHD were not met.

5. N.B. did not have an impairment or combination of impairments that functionally equaled the severity of the listings (20 C.F.R. §§ 416.924(d) and 416.926a).

6. N.B. had not been disabled, as defined in the Act, since March 6, 2012, the date the application was filed or any time through the date of the decision (20 C.F.R. § 416.924(a)).

R. 16-27.

## ANALYSIS

a.   **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

The issue is whether the claimant is "disabled" under the definition found in 42 U.S.C. § 1382c(a)(3)(C) which states:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Id. The regulations thereunder mandate the following three step analysis:

> We follow a set order to determine whether you are disabled. [Step One] If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further. [Step Two] If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. [Step Three] If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a). If a claimant's impairment does not meet or medically equal in severity a listed impairment, the Commissioner considers how the child functions in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). There will be a finding of functional equivalence if there are marked limitations in two of the domains, or an extreme limitation in one domain. 20 C.F.R. § 416.926a(d). A "marked" limitation in a domain is when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation interferes very

4

seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

b. **Testimony at Hearing.**

Ms. Batiste testified at the hearing.

N.B. received psychiatric care and counseling at The Guidance Center on St. Claude Avenue. R. 37. Her attorney asked that the record be held open to obtain missing treatment records from The Guidance Center. R. 35 and 42. These were received. Exhibit 9F (R. 204-224).

N.B. took Vidan, Clonidine and Risperdal. R. 37. Risperdal was added for her mood swings. R. 37. One minute she was a sweet child and the next minute she was trying to fight other people. R. 38. With the medication, she was unable to control her bowel movements, she soiled herself, and she did not want to eat. She drank Ensure three times a day. R. 38.

To get N.B. to complete a chore, Ms. Batiste had to scream and holler at her. R. 38.

N.B. struggled with reading. It took her forever to read. Ms. Batiste said, "we can still reading like, 2 o'clock . . . [N.B.] still be reading, 5 o'clock, we'll still be on the same sentence till like 5 o'clock." R. 39.

Ms. Batiste received as many as two calls a day from the school concerning N.B.'s behavior. R. 39. The teachers reported that she was crawling all over the floor, swinging on a table in the cafeteria, fighting kids, cheating on a test, and swinging her jacket. She was not paying attention in class and doing her classwork. R. 39.

N.B. had three siblings – two brothers and a sister. R. 40. She was always fighting her younger siblings. R. 40. She did not fight her older brother very much. R. 40. She picked on little kids. R. 40. N.B. had older friends. She did not have friends her age. R. 40.

N.B. pulled out her own hair. She yanked it out. If she had a sore, she picked at it until it bled. R. 40.

N.B. did not mind hurting other people. She recently brought a razor blade to school. R. 40. N.B. told her cousin she would kill him. She told people she would stab them. She never said she would harm herself. R. 40-41.

N.B. did not receive suspensions from school. R. 41. N.B. was suspended from the school bus several times for fighting, running up and down the aisle, and not sitting still. R. 41.

Ms. Batiste's biggest concern for N.B. was her learning and harming other people. R. 41. N.B. had an imaginary friend. R. 41. The imaginary friend was not a positive influence. R. 41. The imaginary friend did naughty things. The imaginary friend told N.B. to do things to other people. R 42. The imaginary friend did not tell N.B. to do good things. R. 42. The imaginary friend would tell N.B. to steal, fight people and not listen to adults. The imaginary friend would tell N.B. that someone had pushed her, when that person had not touched her. R. 42.

At the time of the hearing, N.B.'s teacher was Ms. Ashlyn Williams at the Fannie C. Williams elementary school. R. 42. The ALJ reported that a teacher questionnaire would be sent to Ms. Williams. R. 42-43.

c.  **School Records**.

There was a kindergarten report card from the Fannie C. Williams elementary school for the third period of the 2011/2012 school year. R. 108-110. It reported that N.B. had made some progress. She needed plenty of guidance and support from Ms. Baptiste and her teacher. Ms. Batiste was asked to help her with nightly assignments.

On May 9, 2012, Ms. Henry, N.B.'s kindergarten teacher, completed a teacher questionnaire. R. 137-144. She had known N.B. for nine months. She taught N.B. all subjects.

She was with N.B. seven hours a day.  N.B. was below level in reading, on level in math, and on level in written language.  R. 137.  N.B. needed help with many of her lessons.  She could not stay focused for a long period.  R. 138.  She was given extra time to complete assignments.  R. 139.  She was given time out.  When this did not work, she was given time out during enrichment.  R. 140.  She had a lack of control.  Sometimes she pulled the weave out of her hair until she pulled her hair out.  She would scratch a bump until it bled.  R. 142. When she was on her medication, she was able to sit still longer and observe her daily lessons.  She often told students and some teachers that she was another person and wanted to be called by a different name.  R. 143.

There was a first grade report card dated May 7, 2013, for the 2012/2013 school year.  She had A's and B's in all subjects for the four intervals, except she had C's in the third and fourth interval for language arts and a C in social studies for the fourth interval.  R. 174.

In May 2013, Ashlyn Williams completed a teacher questionnaire.  R. 165-172.  She had known N.B. for one year (2012/2013).  She was with N.B. from 7:50 a.m. until 3:15 p.m.  She was her teacher for all subjects, except P.E.  N.B. was on level in reading, math and written language.  R. 165.  N.B. needed structure.  Paraprofessionals came into the classroom to provide additional help and support when needed.  R. 166.  She was in time out in physical education.  She did not follow directions and distracted others nearby.  R. 167.  She was suspended from the school bus for five days.  She was required to sit by the driver.  She did not remain in her seat.  She tantalized other students (generally older students sitting in the back).  R. 168.  She had difficulty transitioning from the classroom to the cafeteria and from the cafeteria to the recess yard.  She digressed during bathroom breaks.  R. 169.  Problems related to caring for herself

occurred mostly on the school bus.  Her physical needs were attended to.  She lost her outerwear and behavior folders.  R. 170.  She was rarely absent.  R. 171.

### d.     **Medical Records**.

On January 24, 2011, N.B. was seen by Vithavas Tangpricha, M.D., a primary care physician, with complaints of fever, cold, coughing, vomiting and diarrhea.  Except for her ears and nose, the physical exam was normal.  Medication was prescribed.  R. 186. On February 18, 2011, N.B. returned to Dr. Tangpricha.  The physical examination was normal, except for the abdomen.  R. 185.

On March 1, 2012, N.B. and Ms. Batiste were seen at The Guidance Center, Inc.  R. 197-201.  Ms. Batiste indicated that N.B. wet the bed or soiled her clothes and had difficulty with coordination.  R. 201.  An initial assessment was completed.  R. 188-96.  Among the reasons that Ms. Batiste sought help was N.B. disrupted class, fought with older children, fought on the school bus, used another name, would not do homework, and talked to herself.  Her aggressive behavior began about two years before.  Ms. Batiste was interested in medication and counseling.  R. 188.  On the mental status exam it was noted that she had bald spots where she pulled her hair and she was hyperactive and impulsive.  R. 193.  She was diagnosed with Oppositional Defiant Disorder (ODD); ADHD, Enuresis, and Trichotillomania (impulse disorder characterized by compulsive urge to pull out one's hair or skin picking).  The Global Assessment Functioning ("GAF") was 40.  R. 196.

On March 5, 2012, medication was prescribed.  R. 189.  Patrick J. Dowling, M.D., a psychiatrist, completed a psychiatric evaluation.  The diagnosis was ADHD, Mood Disorder and GAF 40.  R. 190-92.

On March 22, 2012, The Guidance Center reported that N.B. had been enrolled in an outpatient behavioral health program since March 1, 2012. She was diagnosed with ADHD. Medication was prescribed. R. 203.

In the spring 2013, a reassessment was completed by Christina Beauregard, a social worker at The Guidance Center. R. 214-23. The diagnoses were ADHD and Mood Disorder. The GAF was 50. Vyvanse and Clonodine were prescribed. R. 222. Progress toward decreased hallucinations was made when N.B. was on medication. She was less hyper on medication. She needed a high level of services to improve focus, lessen hyperactivity, decrease psychotic features, decrease her fears around hallucinations, and improve sleep. R. 222.

On April 1, 2013, N.B. was seen by Dr. Dowling, who diagnosed her with ADHD. He prescribed Vyvanse and Clonidine. R. 224. The medications wore off during the day. Dr. Dowling and Ms. Batiste discussed giving medication to N.B. at school. R 224.

e.   **Plaintiff's Appeal.**

**Issue**.  Is there substantial evidence for the ALJ's finding that N.B. has a less than marked limitation in the ability to care for her herself?

The ALJ determined that N.B.'s impairments did not meet or medically equal in severity a listed impairment. R. 16. The next step in the analysis required the Commissioner to consider how N.B. functioned in terms of six domains. Ms. Batiste's appeal is concerned with the ALJ's finding in the fifth domain - caring for yourself. The ALJ determined that N.B. had a less than marked limitation in the ability to care for herself. Ms. Batiste contends that this finding is not supported by substantial evidence. She urges that the evidence demonstrates that she has a marked limitation in the ability to care for herself. Rec. doc. 15 (Memorandum at 4). If the ALJ had found that she had a marked limitation in the fifth domain, there would have been a finding of functional equivalence as there would have been marked limitations in two of the domains

(the second domain-attending and completing tasks [R. 21-22] and the fifth domain-caring for yourself).

A "marked" limitation in a domain is when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2).

Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Perez, 415 F.3d at 461. Ms. Batiste argues that the evidence relied upon by the ALJ for the finding at the fifth domain is not more than a scintilla. While acknowledging that the Court cannot reweigh the evidence, Ms. Batiste urges that the evidence overwhelmingly supports a finding that N.B. had a marked limitation in the fifth domain.

Before considering each of the domains, the ALJ found that Ms. Batiste's statements concerning the intensity, persistence and limiting effects of N.B.'s symptoms were not entirely credible. R. 19.

The Guidance Center records for March 2012 reflected that Ms. Batiste reported that N.B. made up stories about an imaginary friend, Jamelle. R. 188. At the May 2013 hearing before the ALJ, Ms. Batiste was asked if N.B. still had the imaginary friend. R. 41. Ms. Batiste answered in the affirmative. R. 41. She denied that it was a positive influence. R. 41. She testified that the imaginary friend did naughty things, she told N.B. to do bad things to other people, she told N.B. to steal, she told her to fight people, she told her not to listen to adults, and she told N.B. that someone pushed her when that person had not touched N.B. R. 42. The mental status examination indicated that no hallucinations were reported but noted the report of an imaginary friend. R. 193. In The Guidance Center's 2013 assessment, Ms. Batiste reported

significant concerns about N.B.'s hallucinations. R. 218. The mental status examination, however, indicated they were mild. The May 2012 teacher questionnaire does not contain any reference to an imaginary friend, R. 137-144, but noted that she often tells students to call her by another name. R. 143. The May 2013 teacher questionnaire does not contain any reference to an imaginary friend. R. 165-172. The ALJ concluded that the psychiatrists viewed the imaginary friend as normal behavior. R. 19.

On May 8, 2013, Ms. Batiste testified that N.B. did not mind hurting people, she recently brought a razor blade to school, and she told her cousin she was going to kill him. R. 40-41. Ms. Williams, N.B.'s first grade teacher completed a teacher questionnaire on or about May 26, 2013. R. 165-172. While the report described problems in the domain of interacting and relating with others while on the school bus (R. 168), it made no mention of N.B. bringing a razor blade to school. As the ALJ noted (R. 19), there is no evidence confirming Ms. Batiste's statement that N.B. brought a razor blade to school.

Ms. Williams, N.B.'s first grade teacher, reported in May 2013 that when N.B. is on her medication she was able to sit still longer and observe the daily lesson. R. 143.

In May 2012, Ms. Henry, the kindergarten teacher, reported that N.B. was reading below level and she had a serious problem reading and comprehending written material. R. 137-138. A year later, Ms. Williams, the first grade teacher, reported that N.B. was reading on level and there was improvement in reading and comprehending written material. R. 165. These teacher questionnaire responses do not indicate that the reading problem was nearly as severe as Ms. Batiste reported in her testimony. Ms. Batiste testified that her daughter's reading was so bad that she could not read one complete sentence in three hours. R. 39.

In determining that N.B. had less than marked limitation in the ability to care for herself, the ALJ relied on Part V (Caring for Herself) of the May 9, 2012 teacher questionnaire completed by Ms. Henry. R. 26 and 142. Ms. Batiste notes that the ratings in Part V of the May 26, 2013 teacher questionnaire completed by Ms. Williams reflect a decline in some activities. For example, Activities 7 (identifying and appropriately asserting emotional needs), 8 (responding appropriately to changes in own mood [calming self]) and 9 (using appropriate coping skills to meet daily demands of school environment), were rated as obvious problems in 2012 and serious problems in 2013. R. 142 and 170. The 2013 assessment, however, indicated that N.B. had good self-care and self-esteem. R. 216. For the 2013 mental status exam, there was no report of self-abuse. On that exam, N.B.'s appearance was described as well-groomed. R. 220. The 2013 assessment reflected that N.B. had made some progress towards decreased hallucinations and was less hyper on medication. The goals were to "focus at this time on <u>continuing</u> to help client improve her focus and decreasing hyperactivity. . ." R. 222 (emphasis added).

The issue raised by Ms. Batiste is whether there is substantial evidence in the record to support the ALJ's decision that N.B. had less than marked limitation in the ability to care for herself. The ALJ properly determined that Ms. Batiste's statements regarding M.B.'s symptoms were not entirely credible. The ALJ considered the medical evidence and the evidence provided by the kindergarten and first grade teachers at N.B.'s school. There was substantial evidence that N.B. did not have an impairment in the domain of caring for herself that interfered seriously with her ability to independently initiate, sustain and complete activities required in that domain for a school-age child.

**RECOMMENDATION**

IT IS RECOMMENDED that: (1) the Commissioner's motion for cross-motion for summary judgment (Rec. doc. 16) be GRANTED; and (2) Ms. Batiste's motion for summary judgment (Rec. doc. 15) be DENIED.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 23rd day of June, 2015.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**